## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**04 ) 10061 RWZ**

|  |  |
|---|---|
| ROBERT REUBEN, on Behalf of Himself and all Others Similarly Situated, | ) ) CIVIL ACTION NO. |
|  | ) |
| Plaintiff, | ) CLASS ACTION COMPLAINT |
|  | ) FOR VIOLATIONS OF THE |
| v. | ) FEDERAL SECURITIES LAWS |
|  | ) |
| CLEAN HARBORS, INC., ALAN S. MCKIM, and ROGER A. KOENECKE, | ) **JURY TRIAL DEMANDED** ) |
|  | ) |
| Defendants. | MAGISTRATE JUDGE Alexander ) |
|  | ) |

Plaintiff, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through his attorneys, which included, among other things, a review of the public documents and announcements made by Defendants, and Securities and Exchange Commission ("SEC") filings, and press releases regarding Clean Harbors, Inc. ("Clean Harbors" or the "Company"), alleges, for his complaint, as follows:

### NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of Clean Harbors securities between November 19, 2002 to August 14, 2003, inclusive, (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Defendant Clean Harbors is a Massachusetts corporation with its principal place of business located at 1501 Washington Street, Braintree, MA 02184. Clean Harbors describes itself as

a provider of a wide range of environmental services to a diversified customer base in the United States and Puerto Rico through its subsidiaries. Clean Harbors' stock is traded on the NASDAQ National Market ("NASDAQ") under the symbol "CLHB." Through the Class Period, Clean Harbors made numerous false and misleading public statements concerning the business and prospects of the Company. During this time Defendants and other insiders sold over $1.7 million worth of their privately-held Clean Harbors stock. When news of Clean Harbors' losses was revealed on August 14, 2003, the price of Clean Harbors stock dropped by almost one-third, from $9.50 per share on August 13, 2003, the day before the announcement, to $6.23 per share on August 14, 2003.

## JURISDICTION AND VENUE

3.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

4.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

5.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District and Clean Harbors maintains its executive offices in this District.

6.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

2

## PARTIES

7.    Plaintiff Robert Reuben, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Clean Harbors at artificially inflated prices during the Class Period and has been damaged thereby.

8.    Defendant Clean Harbors is a corporation organized under the laws of Massachusetts with its principal executive offices located in Braintree, Massachusetts.

9.    Defendant Alan S. McKim ("McKim") during the Class Period was Clean Harbors' President, Chief Executive Officer, and Chairman of the Board.

10.    Defendant Roger A. Koenecke ("Koenecke") during the Class Period was Clean Harbors' Chief Financial Officer and Senior Vice President.

11.    Defendants McKim and Koenecke, together, are referred to herein as the "Individual Defendants."

12.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Clean Harbors were privy to confidential and proprietary information concerning Clean Harbors, its operations, finances, financial condition, present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Clean Harbors as discussed in detail below. Because of their positions with Clean Harbors, the Individual Defendants had access to non-public information about its business, finances, products, markets, and present and future business prospects via access to internal corporate documents, conversations, and communications with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof, and via reports and other information provided to them in

connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

13.    The Individual Defendants are liable as direct participants in, and as co-conspirators with respect to the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or as directors were "controlling persons" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Clean Harbors' business.

14.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases, and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

15.    As senior executive officers and/or directors and as controlling persons of a publicly-traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and which was traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect

4

to Clean Harbors' financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Clean Harbors' common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

16.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Clean Harbors' common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Clean Harbors' business, operations, and management and the intrinsic value of Clean Harbors common stock; (ii) permitted the Individual Defendants to sell more than $1.7 million of Clean Harbors' common stock at artificially inflated prices; and (iii) caused Plaintiff and the other members of the Class to purchase Clean Harbors' common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

17.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased the securities of Clean Harbors during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company during the Class Period, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

18.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Clean Harbors common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Clean Harbors or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

19.    Plaintiff's claims are typical of the claims of the Class, as all Class members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

20.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class and securities litigation.

21.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Clean Harbors; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

22.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

23.    Through its subsidiaries, Clean Harbors provides a wide-range of environmental and waste management services to a diversified customer base in the United States, Canada, Mexico and Puerto Rico. The Company is managed in two major segments: Technical Services and Site Services. Technical Services include treatment and disposal of industrial wastes; collection, transportation and logistics management; specialized repackaging, treatment and disposal services for laboratory chemicals and household hazardous wastes (CleanPack Services); and outsourcing of customer's environmental management program (Onsite Services). Site Services performs services including industrial maintenance, surface remediation, groundwater restoration, site and facility decontamination, emergency response, site remediation, transformer decommissioning and oil disposal.

24.    On September 11, 2002, Clean Harbors issued a press release announcing that it had completed the previously-announced acquisition of Safety-Kleen Corp.'s Chemical Services Division ("CSD Division"). The Company reported that as a result of the acquisition, it will be on a "run rate to achieve annualized revenues of approximately $750 million. . . ." Commenting on the announcement, Defendant McKim stated in pertinent part:

7

The CSD acquisition fits squarely with our growth strategy by expanding our geographic footprint, broadening our service offerings and increasing market penetration. . . . Clean Harbors now clearly has the size, scope and strategic assets to be the leading hazardous waste services company in North America. By leveraging our industry-leading IT systems and operational controls, we expect to improve service to our customers, increase productivity and achieve substantial cost synergies. Further, we are committed to achieving our EBIDTA goal of $115 million in 2003.

It has been our plan since February to close this transaction in the third quarter and meeting this milestone is a credit to the capabilities of our entire team. The efforts of both companies throughout this complex and dynamic process allowed us to meet our aggressive timetable. We will now bring the same level of energy to the integration process, which is already well underway.

25.     By the start of the Class Period, unbeknownst to investors, Clean Harbors was experiencing difficulties integrating the operations of CSD with its own and, as a result, was failing to generate meaningful benefits from the acquisition. Moreover, the integration process was distracting the Company from its core business, thereby causing the Company to experience declining results. Notwithstanding the foregoing difficulties, throughout the Class Period, Defendants projected increasing revenues and earnings for the Company, which caused a dramatic increase in the price of Clean Harbors common stock. While the stock was trading at these levels, certain Clean Harbor insiders sold their personally-held Clean Harbors common stock to the unsuspecting public. In addition, Defendant McKim engaged in a forward sale of 200,000 shares of his stock which permitted him to lock in gains in his stock but not suffer from any decline in the price of Clean Harbors stock.

26.     Then, on May 14, 2003, Clean Harbors surprised the market by announcing that its EBITDA for the first quarter of 2003 was below the quarterly minimum required by certain covenants

8

in the Company's loan agreements and that the Company would have to renegotiate the terms of its agreements with its lenders. In response to this announcement, the price of Clean Harbors stock plummeted from $12.89 per share to $10.90 per share on extremely heavy trading volume.

27.    The true extent of the problems at Clean Harbors were not finally revealed until August 14, 2003, when it announced that it would miss its earnings targets for the second quarter of 2003 and that it was being negatively impacted by a variety of factors. Following this announcement, the price of Clean Harbors common stock declined further to $6.23 per share.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

28.    The Class Period begins on November 19, 2002. On that date, Clean Harbors issued a press release announcing its financial results for the third quarter of 2002, the period ending September 30, 2002. The Company reported third quarter revenues of $83.4 million. Commenting on the results, Defendant McKim stated in pertinent part:

> Our base business performed well during the third quarter, particularly when measured against the substantial time and effort required by both companies to close the acquisition and begin the integration process. . . . Backing out the restructuring and acquisition charges, and all acquisition-related costs, the Company achieved break even from operations in the quarter, as well as positive EBITDA. Achieving this positive momentum, in a quarter of great internal activity devoted to closing the acquisition, demonstrates the strength of our organization and the depth of our management team. The integration process is well underway and we are proud of the progress we have achieved to date, including immediately running our entire U.S. operation on the Clean Harbors platform. We remain confident in the quality of the people and assets that we have added to Clean Harbors as well as our ability to recognize $115 million in EBITDA in 2003.

9

We have already benefit[t]ed from significant synergies as we
scale our Company to match our growth potential.

In the press release, Clean Harbors provided the following earnings guidance:

**Fourth-Quarter 2002**

Revenues of $175 million to $180 million
EBITDA of $19 million to $20 million
Diluted earnings per share of $0.16 to $0.21

**Full-Year 2003**

Revenues of $730 million to $750 million
EBITDA of $115 million
Diluted earnings per share of $2.00 to $2.06

29.     Then, on January 6, 2003, Clean Harbors issued a press release announcing that

Defendant McKim had entered into a "Variable Prepaid Forward" transaction with an affiliate of Credit

Suisse First Boston/DLJ. In the press release, the transaction was described as a "tax deferred

forward sale of up to 200,000 shares of Clean Harbors common stock, in which Mr. McKim will retain

voting rights for all the shares during the three year period and can continue to retain a significant upside

interest in a portion of those shares if the stock price continues to move upward over the next three

years." By engaging in the forward sale, Defendant McKim was able to lock in gains on his Clean

Harbors stock without relinquishing control over the shares.

30.     The statements referenced above in ¶ 28 were each materially false and misleading

when made because they failed to disclose and/or misrepresented the following adverse facts, among

others:

10

(a)    that the CSD acquisition was not providing meaningful benefits to the Company. In fact, CSD was experiencing declining demand for its products and services and many of the receivables that CSD was carrying on its books were uncollectible;

(b)    that the integration of CSD was negatively impacting the Company's ongoing business such that the Company was losing sales;

(c)    that, in addition to the problems attendant to the CSD acquisition, the Company was experiencing declining demand for its products and services; and

(d)    based on the foregoing, Defendants lacked a reasonable basis for their earnings projections and positive statements about the Company and its operations.

31.    On March 13, 2003, Clean Harbors issued a press release announcing that it "requires additional time to finalize financial results for the full year and fourth quarter 2002. . . . the first full quarter to include results from the Chemical Services Division (CSD) that Clean Harbors acquired from Safety-Kleen in September 2002." Commenting on the announcement, Defendant McKim stated in pertinent part:

> Because of the magnitude, complexity and unique nature of the CSD acquisition, we require additional time to complete results for the fourth quarter and full year 2002. . . . The additional time required to finalize our results is not attributable to any negative or material financial problem. There are two primary issues that we are working through with our auditors, both of which have important balance sheet implications.
>
> First, Clean Harbors has determined that proper purchase accounting will require Clean Harbors to discount certain environmental liabilities assumed as part of the CSD purchase price. Because of this discounting, the estimated environmental liabilities assumed as a result of the CSD acquisition, which had previously been announced at

approximately $266 million are expected to be reduced by approximately $43 million. Beginning with the fourth-quarter 2002 results, the newly discounted liabilities are expected to be accompanied by an additional net non-cash accretion expense of approximately $1 million a quarter and a corresponding quarterly reduction in depreciation expense of approximately $700,000.

Second, in addition to the expected reduction resulting from the discounting, both Clean Harbors and our auditors have continued to review the estimated dollar amount of the environmental liabilities that we assumed from Safety-Kleen upon completion of the CSD acquisition. Based on Clean Harbors' anticipated expenditures in 2003 on these environmental liabilities, there may be a need to further adjust the Company's environmental reserves downward.

The Company reported that it expects to report fourth-quarter revenues of $152.5 million to $153.3 million and that net income is expected to be $3 million to $4 million, or $0.17 to $0.23 per share.

Commenting on the results, Defendant McKim stated in pertinent part:

Although revenues were less than previously forecasted, we expect to meet our previous EPS guidance for the fourth quarter, which demonstrates that our cost reductions and integration plan are on track. Throughout the fourth quarter, our energy was primarily focused internally on meeting our integration objectives, including the swift implementation of cost synergies. Through strict adherence to our sourcing and profit-producing initiatives, we anticipate delivering positive bottom-line results.

We anticipate that revenues for the fourth quarter will be below our previous guidance due to a number of factors. . . . Externally, the lack of large emergency events and remediation projects, and continued economic sluggishness limited revenue opportunities. Internally, the combination of instituting new systems and procedures, reducing headcount, and refining our organization also hindered our ability to effectively pursue top-line growth across our entire infrastructure.

32.    In response to this announcement, the price of Clean Harbors common stock declined precipitously falling from $12.69 per share to $8.94 per share on extremely heavy volume. Defendants, however, were still concealing the true operating condition of the Company.

33.    Indeed, in an effort to obscure and continue to conceal the problems at the Company, Defendants represented that the Company was still on track to meet its EBITDA guidance and that the business of the Company was performing well notwithstanding the Company's announcement and the decline in the price of the stock. For example, after the earnings release, Clean Harbors held a conference call to discuss the earnings announcement and the Company's operations. During that call, in addition to positive statements regarding cost reductions and cross-selling opportunities, among other things, Defendant McKim forecast strong results for the first and second quarters of fiscal 2003, stating in pertinent part:

> Now I would like to talk about our outlook for Q1 and 2003. Due to seasonality, Q1 is traditionally the slowest quarter for Clean Harbors. Taking into account the integration process, the effect of what was really a harsh winter and continued economic softness, we expect to achieve Q1 revenues of $140m to $150m. We are also updating our revenue guidance for the year. Based on our current expectations and market conditions, we now anticipate 2003 revenues in the range of $670m to $680m. As we stated in our news release this morning, we remain focused on achieving our previous guidance of $115m in EBITA [sic] and EPS in the range of $2.00 to $2.06 per diluted share. We intend to provide updated annual guidance on our first quarter conference call.

34.    Defendants' efforts were successful and in the weeks following the announcement the price of Clean Harbors common stock began to recover, rising from its closing price of $9.55 per share

on March 14, 2003 to close at $14.08 per share on April 1, 2003, the day it issued a press release announcing its fourth quarter and year-end financial results.

35.    On April 1, 2003, Clean Harbors issued a press release announcing its financial results for the fourth quarter and year-ended December 31, 2002.  The Company reported that net income for the fourth quarter was $4.9 million, or $0.29 per share, and that EBITDA for the fourth quarter was $18.3 million.  Commenting on the results, Defendant McKim stated in pertinent part:

> Our financial results tor the fourth quarter were within the updated guidance range that we provided on March 13. . . . We believe that the reduction in the environmental liabilities that we assumed in the CSD acquisition is a very positive development for the Company and we remain confident in our ability to successfully manage these acquired environmental liabilities because of our experience in applying alternative treatment protocols to contaminated sites.

With respect to financial guidance, the press release stated in pertinent part:

> The Company is affirming its previously announced first-quarter 2003 revenue guidance of $140 million to $150 million.  Based on Company expectations and current economic conditions, Clean Harbors anticipates its revenue for the full year of 2003 will be in the previously announced range of $670 million to $680 million. The Company remains focused on its previously announced goal of $115 million in EBITDA.  The Company will be adopting accounting rule SFAS 143, which requires companies to record liabilities for asset retirement.  The Company will not be providing updated EPS guidance for the year until it has determined the full effect of SFAS 143.

36.    The statements referenced above in ¶¶ 31, 33 and 35 were materially false and misleading for the same reasons stated above in ¶ 30.

37.    Then, on May 14, 2003, Clean Harbors surprised the market when it issued a press release announcing that its EBITDA for the first quarter of 2003 was below the quarterly minimum

required by certain covenants in the Company's loan agreements and that the Company would have to

renegotiate the terms of its agreements with its lenders. The Company reported that its EBITDA for

the first quarter was $7.4 million. Commenting on the announcement, Defendant McKim stated in

pertinent part:

> Despite the adverse impact of a weak economy and the
> uncertainties of war, our first-quarter revenues exceeded the low end of
> our previously announced guidance. . . . We are disappointed,
> however, with the bottom-line contribution from our operations for the
> quarter. Although the first quarter of the year is historically our slowest
> quarter, and has traditionally been an unprofitable quarter for us and
> other companies in our industry, this quarter's annual cyclical business
> downturn was intensified by several factors. These included a
> particularly harsh winter along the East Coast of the U.S. and
> throughout Canada, the continued U.S. economic slump, which has
> also affected our Canadian business activities, a temporary slowdown
> in government-related work based on restricted access to military
> facilities, and an absence of any major events work. The effects of the
> poor weather were felt across the Company, particularly in terms of
> their impact on margins generated by our incinerator business, where
> utilization was off considerably. We also experienced a drop-off in
> large contaminated soils projects in the quarter, which directly affected
> the profitability of our landfills.
>
> We also encountered higher-than-anticipated costs in several
> areas during the first quarter. . . .These included one-time professional
> services expenses related to the CSD integration, very complicated
> auditing reviews and an unanticipated non-cash currency conversion
> loss based on our Canadian operations. In addition, we experienced
> substantial increases in transportation and utility expenses. These costs
> were well above plan due to the inclement weather and a significantly
> higher-than-expected increase in employee health care costs. While
> many of these items were one-time in nature or weather-related, we are
> taking aggressive action to ensure that we mitigate the impact of these
> cost pressures.

15

The Company also reduced its financial guidance for the fiscal year, reducing its EBITDA guidance to $85 to $90 million as compared to the $115 million figure it had told investors six weeks earlier. Defendants, however, were continuing to conceal the true deterioration in the Company's business and the weakening of the Company's financial position.

38.    In response to the Company's negative announcements, the price of Clean Harbors stock dropped precipitously, falling from $12.89 per share the preceding day, closing at $10.90 per share, on extremely heavy trading volume. In the days preceding the announcement, the price of Clean Harbors stock declined from $14.02 per share on May 7, 2003 to $12.89 per share on May 13, 2003 on no apparent news.

## THE TRUTH EMERGES

39.    The Class Period ends on August 14, 2003. On that date, Clean Harbors issued a press release announcing its financial results for the second quarter of 2003, the period ending June 30, 2003. The Company reported that it suffered a net loss of ($6.8) million or ($0.57) per share. Commenting on the results, Defendant McKim stated in pertinent part:

> While we exceeded our quarterly revenue guidance, our bottom line results were below our expectations as a result of substantial volume shortfalls in our landfill business and other softness in waste disposal volumes into our facilities in the second quarter. The drop in volumes to these facilities is an industry-wide phenomenon that our competitors, as well as our remediation and engineering clients are all experiencing.
>
> We also continued to experience a reduction in revenues from our distributors and brokers due to the increased financial pressures they are facing. . . . We expect these volumes to continue to be constrained because of the uncertain economic status of some of our traditional brokers and our conservative policy of not incurring any substantial credit risks with these customers. In addition to the

16

significant volume shortfall and a competitive market environment, our bottom-line results were affected by higher-than-expected health care costs, the negative impact associated with the strengthening Canadian dollar on U.S. dollar denominated sales in Canada, the settlement of a state sales tax audit and final settlement of outstanding invoicing issues with Safety-Kleen. In total, these four additional factors affected our bottom-line by over $4 million in the quarter.

We are intensifying our program to control expenses and eliminate costs. . . . Furthermore, we are continuing our integration efforts of the CSD assets acquired from Safety-Kleen. We are accelerating the internalization of select transportation and waste disposal functions - steps we previously anticipated taking next year. We are also currently reviewing our network of plants and facilities for areas to further streamline our organization and increase efficiencies. Finally, we are taking more aggressive steps to grow our core revenues, increase EBITDA and regain profitability as quickly as possible. We are seizing opportunities we have identified in several key vertical markets by hiring additional sales personnel during the third quarter.

40.    Following this announcement, the price of Clean Harbors common stock declined from $9.50 per share to $6.23 per share, on heavy trading volume.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

41.    The market for Clean Harbors' securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Clean Harbors' common stock traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased or otherwise acquired Clean Harbors securities relying upon the integrity of the market price of Clean Harbors' securities and market information relating to Clean Harbors, and have been damaged thereby.

17